**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

JOSEPH H. SPANO, JR.,

      Plaintiff,

v.            CIVIL ACTION NO.  2:09-cv-01243

METROPOLITAN LIFE INSURANCE COMPANY,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment [Docket 35] filed by Defendant. For the reasons set forth below, Defendant's motion is **GRANTED**.

*I. BACKGROUND*

Plaintiff worked for Defendant as an insurance salesperson. Plaintiff claims that he was forced to resign in April 2009, after Defendant had accused him of altering a document. On September 30, 2009, Plaintiff filed a complaint in the Circuit Court of Kanawha County, West Virginia alleging monetary damages for unpaid compensation, defamation, and wrongful forced termination. Plaintiff alleges that Defendant has not compensated him pursuant to the West Virginia Payment and Collection Act ("WPCA"), W. Va. Code § 21-5-1 *et seq*. Plaintiff also presents a defamation claim, arguing that Defendant knowingly made false and misleading accusations against Plaintiff to the Financial Industry Regulatory Authority ("FINRA"). Finally, Plaintiff argues that

because he was forced to resign, Defendant is entitled to damages for constructive wrongful discharge.[1]

Defendant removed the action to this Court on November 13, 2009, by invoking diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441. Defendant filed the summary judgment motion on September 10, 2010, arguing that (1) Plaintiff's work environment was not intolerable and Plaintiff voluntarily resigned; (2) the statements to the FINRA were true; and (3) Defendant does not owe Plaintiff any compensation.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ. Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When construing such factual issues, it is well established that the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various

---

[1] Plaintiff's first cause of action sought to invalidate a post-employment agreement with Defendant. The Court dismissed this count based on a joint motion by the parties. (Docket 21.)

2

documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.*

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III. DISCUSSION

*A.     Wage Claim*

Plaintiff argues that Defendant failed to pay him compensation due under the WPCA. Initially, seven compensation items were in dispute. These first four items included Plaintiff's last four paychecks, advisory fees for the second quarter of 2009, a quarterly bonus for the first quarter of 2009, and a monthly bonus for March 2009. (Docket 41 at 16). Defendant argues that with respect to four of the items, Plaintiff admitted he was mistaken. (Docket 35 at 2.) Plaintiff agrees, and he has retracted his claim for these four items. (Docket 46 at 11.)

The fifth and sixth items that Plaintiff believes he is owed are a pro rata portion of a quarterly bonus for the second quarter of 2009 and a pro rata portion of a monthly bonus for April 2009. (Docket 41 at 16.) Regarding these items, Defendant concedes that Plaintiff is entitled to them.

3

However, Defendant argues that Plaintiff is not owed anything because the items were credited against the debt Plaintiff owed. Thus, Plaintiff's debt was simply reduced. (Docket 35 at 2.) Plaintiff explains how commissions are paid in his response: "[C]ommissions come due during the thirteen weeks following termination . . . . At the end of those thirteen weeks, any debts that accumulated, including chargebacks, must be satisfied by setting them off against commission credits." (Docket 46 at 15.) Plaintiff argues that because there is an issue of material fact as to the date when Plaintiff was no longer employed by Defendant, it is unclear how the compensation plan should be determined and whether Defendant's payment system was valid under the WPCA.

As to the final item, first year commissions for sales that had not yet closed as of his termination date, Defendant argues that it was not required to immediately pay Plaintiff under West Virginia law because the items were not due unless and until they were earned. (Docket 35 at 3.)

The WPCA is "remedial legislation designed to protect working people and assist them in collection of compensation wrongly withheld." *Meadows v. Wal-Mart Stores, Inc.*, 530 S.E.2d 676, 688 (W. Va. 1999). Given its remedial nature, the WPCA is to be construed liberally. *Id.* The WPCA states in relevant part: "Whenever an employee quits or resigns . . . the corporation shall pay the employee's wages no later than the next regular payday." W. Va. Code § 21-5-4(c). However, if an employee is discharged, the employees wages must be paid in full within 72 hours. § 21-5-4(b). Wages include "accrued fringe benefits capable of calculation and payable directly to the employee," and fringe benefits include "production incentive bonuses." § 21-5-1. Whether wages have accrued "are determined by the terms of employment and not by the provisions of W. Va. Code § 21–5-1(c)." Syl. pt. 5, *Meadows*, 530 S.E.2d at 676. "[T]he word 'accrued,' as used in the WPCA, [means] 'vested.'" *Gress v. Petersburg Foods, LLC*, 592 S.E.2d 811, 815 (W. Va. 2003).

"The concept of vesting is concerned with expressly enumerated conditions or requirements all of which must be fulfilled or satisfied before a benefit becomes a presently enforceable right." *Meadows*, 530 S.E.2d at 688-89. Thus, before wages are payable to an employee, the wage must have accrued to the employee. *Gress*, 592 S.E.2d at 815. "[T]he WPCA regulates the timing of payment of wages. However, it does not . . . establish how or when wages are earned. Rather, these are matters that arise from the employment agreement." *Gregory v. Forest River, Inc.*, 369 F. App'x 464, 469 (4th Cir. 2010) (citing *Saunders v. Tri-State Block Corp.*, 535 S.E.2d 215, 219 (W. Va. 2000)).

The *Gregory* case concerned an employment agreement where commissions would be paid on shipped units, and if an employee left the employer, then the salesperson would be paid 50% of the commission on any order that was logged but not yet shipped. 369 F. App'x at 469. The court held that the employer violated the WPCA by failing to pay the employee a commission within 72 hours of termination for units that were shipped in the month prior to his termination. *Id.* Plaintiff argues that the court in *Gregory* found the commission payment schedule to run afoul of the WPCA. (Docket 46 at 17.) However, that is simply not the holding in *Gregory*. The court held that the employer was in violation of the WPCA because the employee was not paid within 72 hours of discharge, not because the employer's commission system violated the WPCA.[2] In WPCA cases, courts must consider the specific employment agreement.

---

[2] The court emphasized that it was not deciding "what remedies might be available if an employer . . . unreasonably held wages that were earned at some point after the termination." *Gregory*, 369 F. App'x at 470 n.4. The court added: "we have no occasion to consider whether [the employer's] practice of paying commissions on a monthly basis accords with the requirement of § 21-5-3(a) that an employer must generally pay wages that are due every two weeks." *Id.*

Plaintiff argues that Defendant was required to pay him immediately for sales that finalized in May 2009. Defendant counters that under Defendant's published rules, commissions for employees did not accrue until the end of the quarter. (Docket 41 at 23.) Thus, Defendant would not earn a quarterly bonus until the end of the quarter or a monthly bonus until the end of April 2009. Additionally, Defendant's employees are not guaranteed a commission at the end of a quarter because credits are offset against any debits the employee owes. (Docket 49 at 17.) Plaintiff, therefore, would only receive a payment at the end of a quarter if there was a positive balance at that time. (*Id.*) As made clear in the depositions and the briefing, Plaintiff did not have a positive balance at the end the second quarter. Because Plaintiff's wages, or bonus, had not accrued, then the wages had not yet been earned. The Court finds that there is no issue of material fact regarding when Plaintiff's employment ended. As Plaintiff admitted, he was an at-will employee and his employment ended on the last day of employment, April 17, 2009. The employee agreement is controlling, and thus Plaintiff's wages would not be determined until the end of April and the end of the second quarter. Therefore, Plaintiff is not entitled to receive payment for the fifth and sixth items.

Regarding the final item, commissions that closed after Plaintiff's termination, the *Gregory* case is controlling. The court held that Defendant had to be paid for commissions that were earned, according to the employment agreement, during the month of his termination. 369 F. App'x at 470. This amount was clearly distinct from commissions earned after termination. In *Gregory*, the court specifically noted that the WPCA is "silent" regarding circumstances where commissions are earned after employment is terminated. *Id.* The Court agrees with Defendant: it is impossible to owe wages to an employee before the wages were earned. (Docket 41 at 23.) Thus, Defendant could not have

6

paid Plaintiff within 72 hours, or even two weeks, for commissions earned well after his termination. Defendant's employment agreement with Plaintiff determines how commissions after termination would be paid. That agreement specifically provides that post-termination commissions are held for 13 weeks and are only paid if there is a positive net amount. (Docket 35-1 at 8.) Therefore, Defendant was not required to immediately pay Plaintiff the commissions under the WPCA. Defendant could hold the commissions, as stated in the employment agreement, to see if there was a balance owed to Plaintiff after the 13 weeks were up. As the briefing and exhibits make clear, Plaintiff did not accumulate a positive balance. Accordingly, Plaintiff is not owed this final item. Because Plaintiff is not owed any wages under the WPCA, there is no genuine issue of material fact as to Plaintiff's unpaid compensation count, and summary judgment must therefore be **GRANTED** as to this claim.

        B.      *Defamation Claim*

Defamation is "[a] false written or oral statement that damages another's reputation." *Black's Law Dictionary* (9th ed. 2009). A statement is defamatory if it tends to "reflect shame, contumely, and disgrace" upon the plaintiff. Syl. pt. 1, *Sprouse v. Clay Commc'n, Inc.*, 211 S.E.2d 674 (W. Va. 1975). Whether a statement is capable of a defamatory meaning is a question of law for the Court. Syl. pt. 6, *Long v. Egnor*, 346 S.E.2d 778 (1986). In West Virginia, as with most jurisdictions that follow *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964), and its progeny, there are three kinds of plaintiffs in defamation actions: public officials, public figures, and private figures. Syl. pt. 10, *Hinerman v. Daily Gazette Co.*, 423 S.E.2d 560 (W. Va. 1992). A "plaintiff's status sets the standard for assessing the defendant's conduct[;] . . . private figures need only show that the defendants were negligent in publishing the false and defamatory statement." Syl. pt. 2, *State ex rel.*

7

*Suriano v. Gaughan*, 480 S.E.2d 548 (W. Va. 1996). The elements to sustain a defamation claim by a private plaintiff are: "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." Syl. pt. 1, *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70 (1984).

The West Virginia Constitution provides for truth as an affirmative defense to a claim for libel. W. Va. Const. art. III § 8. Plaintiff takes issue with the statements Defendant made in a form document, which was required to be submitted to the FINRA to report Plaintiff's termination. Plaintiff argues in the complaint that Defendant alleged in the form that Plaintiff had altered a document. (Compl., ¶ 11.) Plaintiff claims that the allegations in the form are "untrue, recklessly made, damaging to his reputation and ability to earn income and libelous." (*Id.* at ¶ 12.) However, in the form to the FINRA, Defendant stated: "[Plaintiff] resigned after allegations were raised with respect to altering a plan document and product replacement." (Docket 37-3.) Defendant's statement was a true statement—allegations were made against Plaintiff and an internal review was conducted. Plaintiff takes issue with the timing of the internal review and claims that he was not technically "under review" at the time of termination. Nevertheless, Plaintiff's last day of work was April 17, and the internal review was not finalized until April 23. Thus, Plaintiff was still under review at the time of his termination. Defendant has an affirmative defense because the statement made in the form was truthful—Defendant simply stated that "allegations" had been made, not that Plaintiff had actually altered any documents.

Additionally, a defendant may raise the defense of privilege. Once a defendant establishes a privilege, the privilege allows the defendant to avoid all liability. *Crump*, 320 S.E.2d at 78. There are two types of privileges: absolute and qualified. *Id.* at 78. Absolute privileges are limited to

8

certain situations such as governmental proceedings, consent of the plaintiff, broadcasts of statements by political candidates, and similar acts protected by the First Amendment. *Id.* (citations omitted). Qualified privileges, on the other hand, are "based on a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public." *Id.*

"A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter." Syl. pt. 4, *Dzinglski v. Weirton Steel Corp.*, 445 S.E.2d 219 (1994). Qualified privileges have been recognized in a number of other situations that do not implicate the interests of a defendant or third party, including the discharge of a public duty, reports of public proceedings, and "fair comment on matters of public concern." *Crump*, 320 S.E.2d at 79 (citations omitted). Unlike absolute privileges, qualified privileges may be defeated by the showing of actual malice, intent, recklessness, publication "to persons who have no reason to receive the information," or with a purpose "unrelated to the purpose of the privilege." *Id.* at 78 (citations omitted).

Plaintiff argues that a privilege defense does not apply to Defendant because "[Defendant's] reporting to FINRA was not done in good faith[,] but instead was done with a bad motive . . . . The only reason [Defendant] published these statements was simply to deter [Plaintiff] from going forward and working in this industry." (Docket 46 at 10.) Plaintiff has not presented any evidence that supports these allegations. On the contrary, Defendant has satisfied its burden by producing evidence that a qualified privilege exists. Defendant had a duty to submit the form to the FINRA, and was thus protected by a qualified privilege. *See, e.g.*, *Dawson v. N.Y. Life Ins. Co.*, 135 F.3d

9

1158 (7th Cir. 1998). Therefore, because Defendant's statements were true and because Defendant was protected by a qualified privilege, there is no genuine issue of material fact as to Plaintiff's defamation claim and the motion for summary judgment is therefore **GRANTED** as to this claim.

    *C.*    *Wrongful Discharge Claim*

Plaintiff's final cause of action is for constructive wrongful discharge. Plaintiff alleges that Defendant conducted itself in such a manner that forced Plaintiff to resign. (Compl., ¶ 40.) Further, Plaintiff contends that Defendant wrongfully discharged Plaintiff "by making false accusations that damaged his reputation, interfered with his ability to earn income and forced him to resign his employment with [Defendant]." (*Id.* at ¶ 41.) Defendant argues that Plaintiff cannot succeed on this claim because Plaintiff was an at-will employee and because Plaintiff's working conditions were never intolerable. Plaintiff agrees that he is an at will employee, and instead argues that his work conditions were intolerable.[3] (Docket 46 at 7.)

"A constructive discharge cause of action arises when the employee claims that because of age, race, sexual, or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment." *Love v. Georgia-Pacific Corp.*, 515 S.E.2d 51, 56 (W. Va. 2001) (quoting *Slack v. Kanawha Cnty. Hous. & Redevelopment Auth.*, 423 S.E.2d 547, 548-49 (W. Va. 1992)). A plaintiff in a constructive discharge case must prove that the "working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit." *Id.*

---

[3] "West Virginia follows the doctrine of 'at will' employment under which either party can terminate an employment relationship at any time, with or without cause." *White v. Nat'l Steel Corp.*, 938 F.2d 474, 487 (4th Cir. 1991).

Plaintiff's argument centers around the claim that Defendant's "continuous action of making false accusations interfered with his ability to earn an income, do his day-to-day job which thus forced him to resign his employment and position with [Defendant]." (Docket 46 at 7.) Plaintiff argues that "[t]he continuous flipping of positions by [Defendant's] representatives was not only confusing to [Plaintiff] but misleadingly cruel." (*Id.* at 7-8.) This argument is in reference to the fact that upon Plaintiff's initial resignation in March, a representative called Plaintiff and asked him to stay. Then in April, after Plaintiff's last day of work, Plaintiff states that representatives continued to contact Plaintiff to ask him to stay with the company. Plaintiff argues that these actions, juxtaposed with the fact that Defendant alleged that Plaintiff altered a document, caused an intolerable environment because it was a "yo-yo effect" that "would not be an acceptable environment for any employee." (*Id.* at 8.)

None of Plaintiff's claims rise to a level that any court would qualify as "intolerable." Plaintiff admitted that his decision to quit working for Defendant was "tough," and he even asked to be "reinstated." Defendant's allegations and the investigation into Plaintiff's conduct were not so intolerable that a reasonable person would be *compelled* to quit. Defendant did not force Plaintiff to leave in any manner, directly or indirectly. Plaintiff's actions also show that the working environment was not intolerable because he asked to come back to work for Defendant. Accordingly, the motion for summary judgment as to this claim is **GRANTED**.

*III. CONCLUSION*

Based on the foregoing analysis, Defendant's Motion for Summary Judgment [Docket 35] is **GRANTED**. A separate Judgment Order will enter this day implementing the rulings contained herein.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: June 2, 2011

_____
THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE